The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and times will be allotted to counsel. The case to be heard today is United States v. Aybar-Ulloa, appeal number 152377. Good morning counsel. Good morning all. This is Judge Howard. Attorney Meisler, would you please mute your audio? And Attorney Clark, good morning. Would you like to reserve any rebuttal time? Yes, Your Honor. Five minutes, please. All right. You may proceed with a two-minute opening statement if you wish. Thank you, Judge. The case before us presents the question of Congress's authority to define and punish felonies committed on the high fees. Based on case law, the fourth restatement, and international law, a felony committed on the high fees is one that either has attained universal jurisdiction or bears a nexus to the United States. The case law I'm referring to is Palmer, Quintock, Furlong, and Holmes. The thread that's woven throughout these cases is a review of citizenship of the people involved and the nationality of the vessel. These lay the framework for what we continue to rely on as the basis for our admiralty law today and Congress's authority to legislate that. From Palmer, we understand Congress cannot define and punish piracy committed on foreign vessels by foreign nationals against non-nationals because those are not crimes against the United States. Quintock and Furlong then proceed further and discuss how piracy has become a crime of universal jurisdiction. The important part, I believe, from Furlong that continues from there is the idea that murder on the high fees provides an additional analysis consistent with what we know from Palmer and Quintock. We look and we see a murder committed by a United States citizen on a foreign vessel still may be punished in the United States. However, a foreign national committing a murder on a foreign vessel is not something within the jurisdiction of the United States. Holmes goes one step further. Again, a murder on the high fees. The captains of the two ships were domiciled in Baltimore. The ships were both in Baltimore. One of the captains was a U.S. citizen. The court focuses again on citizenship and nationality of the vessel when assessing that the murder occurred as a person drowned in the sea. That was not the dispositive piece. This is all mirrored in the restatement which again looks to citizenship and then the nationality of the property involved. The restatement for section 407 requires a genuine connection between the subject of regulation and the state seeking to regulate it. The idea of a nexus is not something novel. It's very well settled within our case law, within international law. Moving on to the issue of universal jurisdiction. Thank you, counsel. I have a question for you. So if you would assume, this is Judge Howard, if you would assume that for purposes of the question that I have concluded that it is not inappropriate, not inconsistent with international law for the United States to exercise jurisdiction, territorial jurisdiction over the vessel itself in this case. With that assumption in place, why is it not reasonable, why is it inconsistent with international law or otherwise inconsistent with due process for the United States to exercise prosecutorial jurisdiction over a person found on the vessel? Why isn't it enough to say that that person who may claim nationality can call on his or her nation for assistance, but why is it unreasonable to permit the United States or otherwise illegal to permit the United States to prosecute that person once it has jurisdiction over the vessel? What's your argument to that? So I guess I'm trying to unpack that question. The court is assuming that jurisdiction already in there and the question before this court is whether the court, whether Congress has jurisdiction. So I guess I'm unclear on the question because it sounds like the question is assuming the answer. I think that to get to the both the constitutional text, but then also the international law and both require a nexus and go to get to the point of having jurisdiction, the offense at issue must either have attained universal jurisdiction or they're a nexus to the United States. So I don't think the issue of consular authority, I think that sidesteps where the question before the court is what the individual may be able to do after he's detained is not where we are. Can he be detained and prosecuted at all? And I think to get there, you have to, again, look. If you look at international law, the only principle that we're dealing with here, the only principle that the government has put forth is the protective principle. The protective principle says that the country may prescribe law for extraterritorial conduct by non-nationals when it's directed against the security of the state or a limited class of other fundamental state interests. I'm going to just highlight that the fourth restatement, which was issued after the panel decision, has changed. The third restatement, the approach is different. It's a more restrained approach. And I think that's not something that can be overlooked in the analysis. So I provided argument to the court in the brief on the idea that directed against the security of the state, there were a few flaws within that. So the first is it can't be- Counsel, let me interrupt you. Thank you. Judge Torreya. Are you aware of any other nation that exercises criminal jurisdiction in other than piracy, slavery, or genocide over stateless nations, stateless vessels? No, because statelessness as a vessel has not attained universal jurisdiction. And frankly, even if it had, I think the point that maybe I haven't made quite so clearly in my brief is that when you're looking at the subjective agreement and the procedural agreement, the subject itself would be the statelessness of the vessel. And so the procedural agreement on jurisdiction would be you could prosecute someone for being- for having been on board this stateless vessel, not for drug trafficking, which is an entirely different crime. I think you can't- the assumption of jurisdiction can't surpass or can't overstep any sort of analysis of whether it's universal jurisdiction or nexus. If you do that, I think the assumption, the underlying assumption takes over the question. Is there any distinction between the jurisdiction that's exercised under MEDLA in this case and universal jurisdiction? Oh, absolutely. MEDLA does not exercise universal jurisdiction. So there are a couple of components to that. So the first is that drug trafficking has not attained universal jurisdiction. We have the restatement of force, which was just issued. It did not, and its list of offenses include drug trafficking. We also know that there is not- there's no universal procedural agreement. So when you look at UNCLOS, when you look at the UN Convention Against the Illicit Transportation of Narcotics, there is no agreement. There's discussion of cooperation, but there is no mandate that countries implement certain laws, regulate certain conduct. There is no agreement that countries must provide jurisdiction to other countries over this issue. So there is no universal agreement as to the- as to drug enforcement standing as piracy. Piracy is something that stands sort of in a very limited class of other offenses. I think you misunderstood my question. My question is, I'm under the impression that the jurisdiction that the United States exercises over the vessel here in question is the equivalent of exercising universal jurisdiction. Well, in my argument, I apologize if I answered a different question, is that I think that's not correct. I think the court- the Congress can't exercise universal jurisdiction over an offense that hasn't attained universal jurisdiction. That's a more direct way of saying- That's not my question. All right. I apologize. That's all right. So I think there are distinctions as well if this is- if the court is getting to. So the- if you look and you compare the MDLEA to international law, it certainly expands beyond. So if you look at the definition, for example, of a stateless vessel and how that's defined, international law is far more limited. It's a vessel that no state has ever authorized to fly a flag, a state has canceled the authorization, or the political entity is not recognized as an international person. The MDLEA provides something entirely different and expands on that. It requires denial of the nation whose registry is claimed. It requires registry. It requires a lack of affirmation unequivocally. Those are things that are not required in international law. And so you end up in a situation, sort of as Mr. Ila found himself, where the captain of his vessel, the master, you know, is belligerent and not responding and not helpful. He did not make a claim of registry and there's no document on the vessel itself. And Mr. Alibar can't do anything to rectify that situation and make it a not stateless vessel. The state where the vessel came from, Venezuela, the state where it's from, the Dominican Republic, have no ability to do anything about the fact that Mr. Sarmiento is being belligerent and not sort of responding to U.S. And so now we have Mr. Alibar spending 11 years in jail in the United States, which is a place he never intended to come, but Mercado says he never intended to get here. I have no further questions at this time. I'll save my time for later. Thank you. Judge Lynch? Yes, I'd like to follow up on Chief Judge Howard's question. It is my understanding that the panel majority in this case, the Victoria decision from the First Circuit, the Moreno-Garcia decision from the Eleventh Circuit, Alvarez-Mena from the Fifth Circuit, basically, that under international law precepts about stateless vessels and their crew, there is no violation of international law for the United States to have exercised its jurisdiction over your client. My understanding of your argument is that it depends first on rejecting that proposition, and second on your assertion that no stateless vessels are nonetheless subject to the rule of universal jurisdiction, and unless there is universal jurisdiction under international law, which you say there is not here, Congress cannot legislate in this area. Am I correct? No, let me take the last part first. There are two ways that Congress can have authority to legislate under Article I, Section 814. Counsel, counsel, counsel, please. Are you rejecting the first premise that there is no violation of international law, that what Congress did is entirely consistent with international law because this is a stateless vessel? Answer that yes or no, and then we will proceed. My apologies, Your Honor. I certainly didn't mean to offend by going out of line. Just answer the question, please. I disagree with that proposition. Okay. The basis for your disagreement, then, is some assumption you are making about international law. I understood that assumption to be that there is no such doctrine. The only applicable doctrine here is the doctrine of universal jurisdiction. Is that correct? No, again, I disagree. You disagree that there is not an independent doctrine of international law that has to do with stateless vessels? So, again, I apologize. I'm apparently not understanding your questions clearly. So, certainly, UNCLOS addresses stateless vessels and the right to board. It doesn't provide jurisdiction as to anything related to what happens after the boarding. I'm sorry. I don't understand your answer, and I will cede my remaining time to my colleagues. Judge Thompson? To follow up on Judge Lynch's question, I understand flightlessness, too. Our case law says that we are allowed to treat a stateless vessel as our own. By that, I thought our case law suggests that we can treat the ship as U.S. territory as well as the nationals as U.S. citizens, which would give us authority to regulate and prosecute their conduct. Could you explain to me why my understanding of our case law is incorrect or why our case law is incorrect? Thank you, Judge. So, I do believe the case law is incorrect. I think if you look to and if you start at the restatement, the restatement doesn't provide any sort of analysis consistent with this theme that the statelessness of the vessel alone provides this universal ability to prosecute any offense that the boarding nation deems appropriate. If you look to the restatement, either there must be universal jurisdiction or this must fall within one of the other principles, territorial, active personality, passive personality, protective, and I'm missing one and I apologize as I'm going through my list, but all of those under section 407 require a genuine connection between the conduct and the state seeking to regulate that conduct. It's not just the vessel itself is stateless and therefore whatever country happens to board that vessel can do as they please with it. Do you find that our case law is inconsistent with what you are saying the restatement says and I would follow up with asking why should we accord the restatement more significance than our precedence? So I do think the case law is inconsistent. I think that it also is inconsistent with when you look to the Supreme Court case law that comes before this, that when you look to Furlong and Palmer and Homes, all of those are assessing effectively a nexus. It's either through U.S. citizenship or the nationality of the vessel. There has to be some sort of connection between the people, the property, the conduct, and the United States. Otherwise, it's not going to be what as the MDOA is written now, frankly, the U.S. can go over to the Indian Ocean, board a ship that has opium on them, and take Afghan nationals who are on a ship that left Afghanistan and say, well, we're going to arrest you, we're going to travel you halfway across the world to the United States, and you're being prosecuted for drug distribution. I mean, When Homes talks about the ability of the United States to prosecute an offense committed by any person from on board a vessel having no national character, what do you take that to mean? The court then also goes through an analysis that it appears that there's the individuals who are the owners of the boat are claiming that they came from elsewhere. But the evidence before the court, as I read that case, is that that ship was built in Baltimore. The owners of the two ships were domiciled in Baltimore. One of them was a U.S. citizen. So there is a connection to the United States there. It's not foreign nationals on a foreign vessel in international waters, having no connection whatsoever to the United States. I think that's the distinction. There certainly are ways, and I don't suggest by any stretch that all conduct on the high seas is outside of Congress's authority to legislate, right? I mean, the point is that it has to have some sort of nexus. It can't just say any felony on the high seas that we deem on our books is sufficient, brings you within our jurisdiction, even though you were not within our territory, had no interest or intent of entering our territory, and no interest or intent of the conduct or items on your vessel from entering our territory. That's where the problem is. And it also doesn't mean that these individuals have no criminal liability anywhere. Mr. Ayobar is a citizen of the Dominican Republic. The boat was going to the Dominican Republic. Certainly there's no question under international law that the Dominican Republic has jurisdiction over this conduct, over this person. It may also be that Venezuela has jurisdiction over this person and this conduct because that's where the narcotics came from. That's where this boat came from. That's where Mr. Ayobar was at one point. The issue isn't that this conduct just is, you know, it's fair game because it's on the high seas. The question is who has the right to prosecute it. Thank you. Judge Kayada? Yes. If we assume that most nations regard the activity in which your client is found to have been engaged in to be unlawful, even if not universal jurisdiction, then why isn't it in the interest of virtually all nations to allow any nation that interdicts and forges a stateless, flagless vessel to proceed forward with prosecution? It would seem to be something that all nations would find in their interest. And yet they have not, right? We have the UN convention against illicit transportation. I'm getting the, I'm getting it slightly wrong, but the most recent UN convention on transportation and narcotics, it recommended only cooperation. It did not identify any specific offenses that the signatory states be required to then prohibit. It didn't provide for anything on jurisdiction other than to say, signatory states go out and enter these agreements independently amongst yourself as to how you wish to deal with jurisdiction, right? So I appreciate the court's sentiment and I don't necessarily personally disagree, but that's just not where we are. The signatory states have not done that. The nations across the globe have not done that. And so the U.S. can't stand for them. It seems, Counselor, it seems you're assuming from silence in those conventions that therefore other states would object. I'm not assuming. So those conventions, the various conventions are not silent on other things though, right? And I think that's the point. So if you look at UNCRA, well, let me ask you this question. Has any nation voiced an objection? Has any nation voiced objections to the U.S.'s interpretation of its jurisdiction with regard to offenses on stateless flightless vessels? I guess I don't know where I would go to get that answer since those individuals don't have standing to object in a particular case. I apologize. I don't know how to answer that question. I think the way Your Honor is intending it. So I'm just getting at, if you were right that we should read into certain conventions, we should read into the absence of any express grant of territorial rights to prosecute, then it would seem that there would be objections when a country like the U.S. asserted such rights. I think it would be problematic to read things into a convention that were vetted extensively amongst the various countries and negotiated extensively in order to gain signatories and then say, well, because this is here, this is not here, we're going to interpret it differently than you are. You must not have objected. I'm not saying you read a grant into those conventions. I guess what I'm suggesting, and correct me if I'm wrong, that they're silent on this issue. They don't prohibit it. The U.S. does it, and no one's objected. Again, how would someone have standing to object in this particular case? Countries would object if they thought that this was not a good thing, a good policy. But Afghanistan can't come to this court and say, I'm aware that Mr. Ayyubar has been arrested, and so, therefore, I object to his arrest. This isn't the forum where that would occur. The forum where that would occur would be in the negotiation of these various conventions and the signature of these conventions. The fact that they have not agreed to that language in these conventions exhibits that there is no universal agreement on the topic. It brings it back to the two specific countries involved. In this case, there's three countries potentially involved. And certainly, there's other case law about consent, and that's included in some of the decisions that are addressed herein. There was no effort to reach out to the Dominican Republic or Venezuela to seek consent of any country to prosecute these individuals. Again, there are other means by which this conduct can be prosecuted. My argument is that the way it was implemented here, that's where the problem is. It's not that it can never be done. It was done incorrectly here. Thank you. Judge Barron? Chief, can I interject here and make another question of counsel? Yes, Judge Ture. I was going to come back to you anyway, but please go ahead. All right. I'll wait until you come back to me. All right. Judge Barron? First question I have is just to make sure I understand something. Is your position that as a matter of international law, there is no prohibition against the United States boarding a stateless vessel on the high seas? Or are you saying that the United States doesn't even have authority under international law to board the vessel? Unclose allows that. I appreciate we're not a signatory to Unclose, but that was related to the underwater seabed issue or something to that effect. Unclose clearly delineates the right to board a stateless vessel. What I would say for now is if you go and you can go ahead. Sorry, I apologize. Okay. Then second, with respect to seizing the vessel, would that be an international law problem under your view? So what's the basis for seizing? I'm asking you, is there an international law prohibition against a foreign nation seizing a stateless vessel on the high seas? So I think that Unclose does not provide that authority. It doesn't provide any sort of agreement amongst the states as to what to do. It would seem that the issue becomes one of the nationality of the individuals on the vessel, and then whether that nationality inures to the vessel in any way, shape, or form. I mean, if you look to Unclose, and I apologize, I don't have the article provision in front of me. But if you look at the pirate ships, they were addressed differently than stateless vessels. Right. Pirate ships, Unclose specifically goes through and says that- Just set aside those other points. Just on the particular question I'm asking you for your view, so that I have an understanding of what your view is. As a matter of international law, is there a prohibition against the United States seizing a stateless vessel on the high seas? Again, I guess I don't know how to answer the question without referring to the authority, but I guess I don't, there's nothing- Set aside the question of whether there's authority. It's just a question- But that is the question, is it not? No, no, not my question. My question is, if a nation gave domestic authority or its country to seize a stateless vessel on the high seas, would there be an international law prohibition against that? Just a yes or no, and then if the answer is yes, there'd be a prohibition. What is the source of law and international law that provides that prohibition? So the answer is the best I understand it. I don't believe that there's any international law, that explicitly prohibits seizing a vessel. I think the issue we're dealing with is after the vessel is seized, can you bring this person into your jurisdiction and exercise your domestic jurisdiction? Okay, so now let's just take this back to the question Chief Judge Howard asked you at the very beginning. If there's no clear international prohibition against seizing the vessel, what is the basis for concluding that there is an international law prohibition against prosecuting the foreign national who is on that stateless vessel? I would initially turn to the restatement force as a starting point, and I would say again, if you look at section 407, which delineates the basis for jurisdiction that is not universal, right? Universal jurisdiction is the exception to the rule of requiring nexus. If you turn to it requires a nexus, and it delineates what that nexus must be. That's helpful. Just two last points. One is, I take it your argument is asking us to read the fourth restatement as if it covers the waterfront, and that it's not properly read to be stating the what to do with stateless vessels. I've seen no international law authority other than what I've cited, and I apologize if my deep dive into this area of the law was not deep enough, but I have no additional authority that I'm aware of that grants this authority over stateless vessels that the government is seeking to use. Okay, that's helpful. The last question, I just want to quote you this passage from Holmes, and I want you to tell me what I'm supposed to do with it. So in Holmes, the court says, the said circuit court had jurisdiction of the offense charged in the indictment. If the vessel on board of which it was committed had at the time of the commission thereof, no real national character, but was possessed and held by pirates, or by persons not lawfully sailing under the flag, or entitled to the protection of any government whatsoever. And I take your point about how the facts of Holmes may be narrower, but that language from the Supreme Court, because it uses the word or persons not lawfully sailing under the flag, reads to me as if it's saying that a flagless vessel is one over which the court would have jurisdiction. I'm just wondering how you counter that language. So the individuals on the vessel are not without nationality. I think that's one piece. I think another piece, and perhaps the, I'm going to guess that this doesn't answer your question, I'm going to apologize in advance. But if you look to the NDLEA and what it deems a stateless vessel to be, and the requirements that it's imposing to determine statelessness, that's much broader and requiring something different than what international law requires. And so a stateless vessel under the NDLEA is not the same as a stateless vessel under international law. International law's definition is much more limited. Again, I'm not sure if I answered your question, so I certainly apologize. Well, I guess maybe just one last follow-up. If we set aside for a moment the question of whether this vessel was stateless in the sense Holmes was talking about, do you have any argument as to why that language from Holmes does not require us to conclude that the U.S. did have jurisdiction here? So I don't think Holmes undoes any of the analysis that you start with from Palmer, Klintock, and Furlow, which is ultimately looking at a nexus. It's looking at the citizenship of the vessel. Holmes doesn't undo that, and certainly the case law that follows, I don't think, and certainly the scholars that have addressed the basis, the origination of admiralty law in those four cases, I'm unaware of anyone who has spoken to that issue and said that means that any felony on the high seas is fair game, no matter the nationality of the person of the state. Any government, any country can come in and take those individuals and say this is a felony in our country. Thank you, counsel. Judge Torrea, do you have follow-up questions? Yes. This question of silence that has been discussed here, are you aware of the fact that in both the Rome Convention and the Illegal Drug Trafficking Convention, the issue was brought up in Rome by the United States and in the Illegal Drug Convention by Canada, in which it was attempted that those conventions cover drug trafficking, and it was specifically rejected? I will accept your honest assertion. I'm not aware, in particular, of all the negotiations that went on within there. I do understand that there were negotiations about specific drug trafficking offenses, and there was no agreement, and so the convention remained silent, and I think the court can't interpret silence being something different than there is no agreement. Well, that depends on what happened before the place. Certainly, and certainly I think it's important that there was some discussion and there was no agreement reached. All right. Thank you. Counsel, I'm going to give you a minute to wrap up unless you would like to reserve your wrap-up time for rebuttal, but let me first just run down through the other judges to see if anyone else has any more follow-up questions at this time. Judge Lynch? No. Judge Thompson? I'm fine. Judge Thompson, you may be muted. I'm fine. I'm unmuted. Thank you. Judge Chiara? Okay. No, thank you. And Judge Barron? I'm fine, thanks. Ms. Clark, you may take a minute to wrap up if you would like, and we will be coming back to you. I will just reserve for my rebuttal. I'm quite confident I'm well over my 25 minutes at this point, so I don't want to overtake any greater than necessary, so thank you, Your Honor. Thank you. We're just trying to get it right, so would you please mute your audio at this time, and, Attorney Meisler, you need to unmute your audio, and you may proceed with an opening statement. Good morning, Your Honors. You may please record. Do you hear me, first of all? Yes. Yes, thank you very much. Scott Meisler on behalf of the United States. Many of the Court's questions today are focused on issues of international law, so in the brief opening I'll give, I just thought I would sketch out and remind the Court that we have a threshold question posed by the Court's first en banc question about whether international law constrains Congress's powers under Article I, Section 8, Clause 10 of the Constitution, and our position is that it does not, that nothing in the text of the Constitution supports that, and that if you look at the drafting history of the Constitution and that clause, the way it was crafted, in particular the views of James Madison, you'll see that the framers specifically rejected analogies to state law and, I think critically here, to English law, which is the source of foreign law that would have been most familiar to the founding generation, and so we think that if the Court chooses to, it could resolve some of these international law difficulties by holding, at least as an Article I matter, that international law principles of prescriptive jurisdiction that have largely been honed and crystallized in the 20th century do not apply and do not limit Congress's Article I, Section 8 powers. Beyond that, Your Honor, I think I would, just walking through some of the jurisdictional principles we've addressed in our brief, I'll try to focus a bit throughout my questions here on statelessness, and we do believe that this Court's decision in Victoria, mentioned by Judge Lynch in her question, was correctly decided. It accords with the views of all other circuits to have addressed this issue. We haven't seen anything in the international law sources, the restatement, or any other case cited by the reasoning of Victoria, and I think it's critical also to recall, Your Honor, that Victoria, although it came after the MDLA's passage, relied on cases that had all been decided between the passage of the 1980 Marijuana on the High Seas Act and the MDLA in 1986. So when Congress was looking at this in 1986 and enacting the MDLA, it had no reason to suspect that it was somehow transgressing principles of international law, and to the contrary, in the Pinto Mejia case in the Second Circuit mentioned by Judge Lynch, the Court there reviewed at length the legislation and the expert testimony before Congress in 1979, 1980, and it said that Congress's understanding about international law and the lack of a nexus requirement for stateless vessels was not just reasonable, but correct. And so I think it would be surprising at this point if Congress misunderstood international law in 1986, all the circuits also misunderstood it, and it would be, I think, disruptive to the area, the state of law in this area, for this Court to change tact at this point, some 40 years into Congress's effort to legislate the serious problem in this area. Counsel, let me pick up then on your mention of nexus, because as I understand it, if there is a place where that may be is not so much in whether it's appropriate to exercise territorial or otherwise exercise jurisdiction over the flagless or stateless vessel, but for the question of prosecuting a national on board the vessel, there is a teasing out of some sort of a nexus requirement perhaps for due process purposes, and in light of what I consider to be somewhat inscrutable statement in Furlong, or maybe that statement in Furlong means something, why are those courts wrong, those that do require a nexus requirement? So first of all, Your Honor, I think that the courts that require a nexus requirement have done so, as you indicated, under the rubric of due process, not familiar with any of them that have imported that requirement into Congress's powers under Article I. Secondly, I think no court has required a nexus in the context of a stateless vessel, and the most notable decision there, I think, is from the Ninth Circuit, because the Ninth Circuit, as Your Honor mentioned, in the Davis case for a foreign flag vessel, did require a international law, useless in teasing out what that nexus would be, but when it came time to decide the nexus issue as applied to stateless vessels, the court reached the opposite conclusion, and I think its reasoning is pretty powerful there. It talked about how when a crew member or the captain of a vessel submits itself to the jurisdiction of a flagged state, it might have a reasonable, that person might have a reasonable expectation that that is the state that is going to exercise prosecutorial authority over any misconduct the person commits, but certainly when the person boards a stateless vessel and refuses to submit himself to the jurisdiction of any state, that person forfeits the right to object to the assertion of prosecutorial jurisdiction by any nation that encounters that vessel on the high seas, which is a territory beyond the sovereignty of any nation. And as far as Furlong, Your Honor, I will also admit to being perplexed by some of the language in Furlong. It's a difficult opinion to parse. At certain points, Justice Johnson lapses into the first person and seems to be speaking for himself and sharing his own views on matters, but I think Furlong is best read as a case addressing principles of statutory construction, and really along with Palmer as cases that are kind of early examples of what we might now call the Charming and Betsy canon, where the court had doubts about the U.S. authority under international law and congressional intent, and that's why in Palmer, for example, the court declined to read very broad language in the statute that says any person to reach as far as that language might naturally extend. Thank you, Counsel. Judge Torreya? Yes. Good morning, Counsel. Good morning, Judge. Counsel, how would you define universal jurisdiction? So I think I don't disagree with the way Ms. Clark has presented in her brief at all. I think it does have a substantive component of certain offenses that reach a level of severity and heinousness, and then it does have a substantive component and a procedural component. Counsel, please listen to my question, and we'll save a lot of time. I'm asking you how you would define universal jurisdiction. Yes, I think it has a substantive component and a procedural component. The substantive component relates to the heinousness of the crime, and the procedural one relates to international acceptance that the crime, because of its heinousness, can be prosecuted by any country, no matter where it occurred. Okay. Is there any difference between what you have defined as universal jurisdiction and the jurisdiction that has been exercised by the United States in this case? Yeah, I think the answer is yes. I make two points. The MDLEA is not purporting to assert universal jurisdiction, because when it reaches into the territorial seas of a foreign country, it's only doing so pursuant to consent, and the consent under this court decision in Robinson, as recognized in the Restatement Fourth, is a valid basis for jurisdictions, prescriptive jurisdictions, under international law. When it happens here, on the high seas, outside the territory of any nation, we are relying on the stateless character of the vessel. And so I understand you could view that as a form of universal jurisdiction, but I think, as we've pointed out, and as even Judge Lopez's defense and Marcos Lucci recognized, these concepts of statelessness and flag state authority are somewhat sui generis in international law, because of the rules that apply to maritime areas, and because of the history of the law of the sea. And so I do think that statelessness is something apart from universal jurisdiction, but in some sense, it shares the attribute of universal jurisdiction, that the connection between the nation asserting jurisdiction and the criminal conduct, maybe can be perhaps could be more attenuated than under other heads of state. Well, I think maybe I could pick one of your your honor's own examples, right? The MDLA is not purporting to say that... I'm not asking you what it's purporting. I'm asking you what is the difference that you find between the jurisdiction that has been exercised by the United States, and then that would be exercised under universal jurisdiction? Yeah, the bottom line to the to the person who's apprehended, I don't think is minimal, Your Honor. But I don't think that's surprising, because I think these multiple heads or categories of jurisdiction under international law overlap. I think your opinion in Smith, in footnote three, recognize that states may assert multiple bases of jurisdiction. I don't think that the bottom line person is that different. But it's important, Your Honor, to distinguish between assertion under accepted bases of maritime jurisdiction, which, again, even if it resembles universal jurisdiction, is a different concept. And it's unique to the high seas. And some of the some of the hypotheticals that Your Honor has posited in dissenting opinions, such as regulating the contract of Bolivian nationals in Peru or Colombia, the MDLA doesn't reach that far. And unless it has a high seas connection, of course, and the Define and Punish Clause in Article 1, Section 8, Clause 10 can't reach that far, because it has a built in geographic limitation to the high seas. And so whatever... I guess I'm not gonna get an answer. So let's go go to another subject. You rely on Smith and Victoria and the other cases that are cited therein. If I read those cases, in every single one of them, there was a U.S. connection. In Smith, the vessel was caught off the Massachusetts coast, and they were transferring marijuana from a Colombian vessel or Venezuelan vessel to a U.S. vessel. And there were at least almost 10 persons on both vessels that were U.S. citizens. In Victoria, as I remember, there was also a... There was also a U.S. connection because the charts that were found on board the vessel, and the equipment that was found on board the vessel, and the direction that the vessel was taking was towards the United States. There's also U.S. connections in all the cases. Let me just take a minute to mention them. Starting with Alvarez-Mena, I don't want to interrupt, but are you saying that there was a... I just want to understand your question. You were saying that in all the cases cited in Victoria from other circuits, you believe that a nexus existed between the United States and the conduct it issued? In Alvarez-Mena, the vessel was headed for Brownsville, Texas. In Rica, it was 73 miles from Long Island and headed for U.S. In Marino, Garcia, there's a similar situation. I won't take up the time, but in every one of those cases, including Pinto, Mejia, and Howard, every one of them has a U.S. connection. Does that make any difference? Well, no, your honor. I think... Well, let me say two things. First of all, I think that the frontline holding of all those cases was no nexus required. And as I recall, Alvarez-Mena, the court dropped a footnote at the end saying, if nexus was required, it might have been in Victoria. I think we mentioned this in our supplemental reply brief. If the court adopted a nexus requirement in this case, I think we would certainly like to think that the standard would be as forgiving as the one your honor is suggesting from Victoria. But I don't know, quite frankly, if a seizure of a vessel 60 miles off the coast of Columbia, hundreds of thousands of miles from the U.S. with a navigational chart pointing toward what the court said was southern Florida or the northern Bahamas would be enough. And again, if the court adopts a nexus requirement, I don't want to foreclose the possibility that facts like Victoria would satisfy it. That would certainly be in the government's interest to have the standard be that forgiving. But if the court wants an example of what would happen, what kind of inquiries it might have to engage in, I guess I would invite you again to look at the Ninth Circuit cases since it decided Davis. There's not a huge sample size there because it has not applied the nexus requirement in stateless vessel prosecutions, which are a bulk of the prosecution. But in cases like Perlaza and one case called U.S. versus Zakharov decided the same year as Perlaza, the court engaged in a multi-factor test that included battles of the experts, multi-day evidentiary hearings, required the government to match up the packaging on cocaine, on cocaine bales that were found in those vessels with cocaine previously found in the U.S. and discussed again navigational charts and whether it was plausible to conclude that the vessel was pointed toward the U.S. as opposed to a different destination. And so I do think that if the court goes down the nexus path, it will be an open question about when we will be able to satisfy that. And then from a legislative intent standpoint, I do think that whatever else Congress is trying to do since 1980 in this area, the core conduct it wanted to cover, and this is abundantly clear from legislative history in this court's decisions, the core trafficking on the high seas, on stateless vessels, without proof of a U.S. destination, which as the D.C. Circuit put it in Ballestas, often proved elusive. Counsel, thank you in the interest of people moving. Judge Toria, we will come back to you if it's okay. Judge Lynch? Yeah, can I just make one more statement? Because... Yes, of course. Victoria specifically says, quote, the boat appeared from the charging equipment heading to be sailing toward Florida. Okay? Yes. Judge Lynch? Counsel, while the only issue before us concerns the MDLEA, of course, courts are concerned about the analysis established in one case being applied to a different statute. So I'd like to mention 18 U.S.C. section 2283, which also concerns vessels on the high seas, and it prohibits the knowing transportation of explosive or incendiary devices, biological agents, chemical weapons, or radioactive nuclear material, knowing that it's intended to be used to commit offense. So as I understand the argument being made by Ibar here, that the statelessness of the vessel is in a sense irrelevant to the question of whether one can prosecute individuals found on stateless vessels on the high seas, wouldn't that argument also apply to section 2283? Your Honor, I'm not familiar with the statute and whether it has any jurisdictional component. I think the one, the threshold question the court would have to answer there, of course, is whether these international law principles restrict Congress's ability to legislate in that area. If the court answered that question in the affirmative and said, yes, we have to look to international law, either under Article I or due process, and statelessness were out, then yes, it would potentially affect the ability of the United States to apply its law in that setting. Okay, the second question, you opened with urging the court to follow a different method of analysis than the questions from the court have suggested. You opened with an argument that we should simply declare that international law was never meant to be a constraint on the Article powers of the Constitution. In many ways, that strikes me as being a far broader proposition than the various propositions that have been argued. I can understand why it's in the government's interest to want to push in that direction. But other than your interests, prosecutorial interests, why would one want to follow that line of reasoning? So, Your Honor, I don't want to suggest that we feel that's the way the court should resolve the case. We are perfectly content with the way the panel resolved this case. And as you suggested, principles of judicial minimalism, the actual under principle of not biting off more constitutional work than necessary would point in that direction as well. We simply address the first question this court has posed in its own long order. And as a matter of logic, if you resolve that question in the government's favor, you wouldn't have to reach the other ones. But I do agree with you, Your Honor, it is a unresolved question. To my knowledge, no other circuit has dug in. It does require looking to drafting history of the Constitution and parsing some early Supreme Court decisions that are subject to interpretation as Chief Judge may have indicated. So I don't want to suggest and leave the court with the impression that we are pushing very hard in that direction to understand the court's desire to issue a more minimal decision and to leave more difficult questions or applications out of the MDLEA for a different day. We have no problem with the way the panel resolved this case. Okay. I thank you for the clarification. I think it's important. No more questions. Okay. Judge Thompson? Counselor, I'm trying to determine how broad you think the authority of the Constitution is with respect to stateless vehicles. Vessels, I'm sorry. Is it your position that it's virtually a free fall when it comes to stateless vessels and that we can prosecute any felony violation of our laws that occurs thereon? So I think you'd break that down, Your Honor, in a couple of ways, right? The first one is the Article I question, right? Whether a crime that Congress has prescribed and applied to vessels on the high seas is a felony falls within the felony's definition of Article I, Section 8. In that regard, we do think that Congress has a significant amount of leeway. There may be some outer limits there that would turn on the gravity of the offense and that makes a felony subject to punishment in the first place. That would be the Article I question the court would address. Can you give me an example of what in your mind would be an outer limit based upon the way you define the authority of Congress? Right. Well, I don't want to suggest that anything is insufficient. I don't want to get rid of... I'm not sure that I have an example in mind, Your Honor, of what's insufficiently serious. Here's what I would say. The court should look to the kinds of crimes that early... It can look to the kinds of crimes that early Congress's thought fell within the felony's power. We've given the example of manslaughter in the 1790 Crimes Act. The very next provision had maiming aboard a vessel on the high seas. That's Section 13 of the Crimes Act. In the 1825 Crimes Act, Congress prescribed assault with a dangerous weapon aboard a vessel on the high seas and also at the same time passed a statute that's still in federal law in different form about conspiring to destroy or burn a vessel on the high seas for purposes of committing insurance fraud in the Section 23 of the 1825 Crimes Act. Those are kind of offenses that Congress, I think, thought were serious enough to fall within its felonies clause jurisdiction. But in terms of the outer limit, Your Honor, I think the outer limit under this court... But, Counselor, I'm sorry. Is that dependent upon statelessness? I mean, would felonies also extend to flagged vessels or are you arguing that it just for So I think the statelessness question, Your Honor, only really matters as a matter of international law. I think I would separate the two questions. The first one is what can Congress do under the Constitution? And if Congress... And that, I think, turns on what the meaning of felonies committed on the high seas is. As a constitutional matter, the backstop that this court adopted in is a due process limitation. It's not an Article I question. It's a question of fundamental fairness and arbitrariness under the due process clause. And in that instance, Your Honor, I think we would probably be in agreement with the Third Circuit's formulation. Again, if the court is going to apply the fundamental fairness standard under Cardallis, what the Third Circuit has said is that may preclude the U.S. from enforcing its law extraterritorially in a way that the conduct was generally lawful on an international basis. So if it was shocking or surprising that the U.S. was criminalizing something, a defendant, in theory, would have a case-specific substantive due process objection to its prosecution. I want to add the caveat, Judge Thompson, because I think it's an important one, that I'm not sure any circuit has adopted that in the case of stateless vessels, because to the extent that courts have looked to international law as a rough guide, in this setting, they have recognized that stateless vessels really aren't subject to due process notice concerns at all. And in the most recent case, I think it's instructive, is the Second Circuit's decision in Vander End, just from last year, cited in our briefing, because the Second Circuit, in other settings, had applied a due process nexus requirement. I don't think it had ever invalidated a conviction on that basis, but it had articulated one, and yet it declined to extend that and apply that to drug trafficking on a stateless vessel under the MDLEA. I hope I answered your question. Yes. Judge Kayada. Yes, thank you. I don't have any questions. Judge Barron. I just want to make sure I understand the breadth of your argument about Congress's power, recognizing that you also think that a more limited version of it would suffice to uphold the statute. I think you take the word felony to include just an ordinary assault to be a felony. Yes, Your Honor. I think if you are viewing it through the example of the Early Crimes Act, then I think the answer is yes. And your view, then, is that it follows that there would be no problem under Article I, maybe there would be a due process problem, but no problem under Article I with Congress passing a statute criminalizing any assault by a foreign national against another foreign national on a foreign vessel so long as it was on the high seas. In Article I matter, I think that's correct. And you take that view that statute to be applied against its own citizens. Right. And so I think that's the difference. That's the key, Your Honor. That is the protection and the limitation on the statute, which is that it has a geographical nexus and geographical limitation. Congress is not asserting a general police power, it can't, because it is legislating in the limited area of the high seas. Now, I think before a court accepted that, and I think the Palmer and other cases that have been cited here are an indication of this, before a court accepted and applied a statute that way, I suspect that it would subject it to rigorous principles of statutory construction to be sure Congress meant it to apply in that scenario. I think it would apply the presumption against extraterritoriality, and I think it would apply the term investing canon. And if it had any doubts that application of the assault statute aboard a foreign vessel committed by a foreigner would run afoul of international law prescriptive jurisdiction principles, and the statute wasn't clear at that point. Just on that point, you agree that a statute that did criminalize assault inflicted by a foreign national against a foreign national on a foreign flag vessel in the high seas would violate international law. Yes, I don't think I can cite a principle of prescriptive jurisdiction that would affirmably authorize it, you know, under the Lotus principle. I think we, the United States and other nations, can act in the face. And so just on the last point, just going back to the understanding of the founders then, your idea about why they would not have been bothered about Article One, permitting Congress to violate international law in that way is what? Well, I think maybe the Charming Becky canon is a response to that, Your Honor, which is that they would expect, they would themselves wouldn't try necessarily to apply U.S. law in that way, unless they felt that the U.S. interest needed to be protected, and that courts would not read the federal statutes in the most expansive way as to incur violations of international law absent clear indications from Congress. But I think everyone agrees that putting aside the Define and Punish Clause that Congress can legislate in derogation of and in violation of international law if it makes that intent clear. And so I don't I suspect the framers were not concerned that Congress was going to run, you know, use the high seas power, as again, jurisdiction. That's pursuant to an Article One power that they have. The question here is whether they have the Article One power to begin with. Right, but I guess I still don't see, Your Honor, kind of a textual basis for reading international law limits into that power. Last point, and this goes to the narrower set of issues. One possible ground for upholding statute, insofar as we assume an international law limit on the Article One power, would be based on the statelessness theory that is tied to our precedent in Victoria. The other possible ground would be protective jurisdiction. And I guess I'm just trying to get an understanding of how you understand the statute. Earlier in this argument this morning, you said that given the history of when the MDLEA was enacted, Congress would have been operating on the understanding that it would, for the Victoria principle, not have been violating international law in passing the MDLEA. That I assume then means that Congress would have thought it had that authority, even if they could not make the case for triggering protective jurisdiction. And yet, one thing that's just interesting to me about the MDLEA is that there are extensive findings in it which suggest that Congress thought it was asserting protective jurisdiction. Is that understanding wrong? In other words, how am I supposed to understand what authority Congress thought it was exercising? Was it acting pursuant to the Victoria principle, or was it acting pursuant to the protective principle, or was it acting pursuant to both, or does it not matter for purposes of resolving the case? I'm tempted to say all of the above, Your Honor, but because I think it was acting pursuant to both, and that's in part because the MDLEA reaches different kinds of vessels in different kinds of situations. And it differs from the earlier statute, the 1980 Act, in that it applies to foreign flag vessels, both on the high seas and in territorial waters of a foreign nation. So I think it was, Congress thought it was acting consistent with different international law principles, depending on the location of the seizure and the nature and characteristics of the vessel. In terms of the state of the law at the time, Judge Barron, which I think is a really good question and a good point, it is notable that in, I think it was 1985, in the Gonzalez decision from the 11th Circuit that we cited in our brief, and that the panel cited in the Vilchez-Navarrette case in this court, the 11th Circuit did recognize congressional authority, congressional action as being consistent with the protective principle. So that predates the MDLEA by about a year. So I do think that the one court that had, to my knowledge, had looked at this carefully at that point, had come out in favor of protective principle jurisdiction, and that may well have informed Congress's decision and the findings that it made, and hasn't been discussed much this morning, but I do think that those findings are entitled to respect by this court, and I hope that the court would adhere to them here. The last thing I'll say, Your Honor, based on what I just tried to explain, is that I actually don't think that the protective principle comes up, it should be dispositive, I should say, in all that many MDLEA prosecutions. I don't mean to disclaim it, but if the court is looking for I think many of the vessels seized qualify as stateless vessels, vessels without nationality under the Act, and under this court's decision in Robinson, and consistent with the restatement forth, consent is also viable, consent of the foreign nation. So if those end up being accepted principles of prescriptive jurisdiction under international law that support individual MDLEA prosecutions, I'm not sure the protective principle is often going to be dispositive, although for all reasons we stated, we think it does support the Act. Thank you. Judge Ture, a follow-up question? Yes. Counsel, would you agree that the issue of having the traffic of drugs become, come under universal jurisdiction was rejected in both the Rome conference and the illegal drug trafficking convention? I would agree that neither elevated the crime to universal jurisdiction crime, but if I could offer a brief explanation, Your Honor? Would you agree the United States brought up in the Rome conference, and Canada brought up in the illegal drug trafficking conference, and both were rejected by the nations that were part of that convention? I think the answer is yes, as to the first one. I had a little bit of a different take on the UN convention, perhaps than Your Honor does. I'm not familiar with Canada's role, but I do think that what the UN convention did, and I think it's perhaps the most relevant treaty here, was not rejected, but was to push it down, in essence, was to push it down to the regional and bilateral level, and that's Article 17 of the 1988 UN convention, and I think it's highly significant, Your Honor, and this goes to a point that Judge Chiodo raised earlier, that the US has negotiated and been operating under numerous bilateral treaties and maritime agreements since the UN convention, some of which explicitly address the vessels without nationality, and that the international community... None of those bilateral conventions are involved here, are they? Yes, Your Honor, I think that, no, they're not because this is a stateless vessel. The answer is no, counsel. That's fine. Now, the rejection of, in the Rome convention, does that become part of customary international law? I think, Your Honor, as I understand the Rome convention piece of this, it's that the crimes warrant is selected for inclusion in an international tribunal, so I think the US, to my knowledge, is not currently participating in that, but I don't know if that was to tell a nation to handle this domestically, handle this through their municipal laws, which is what the US has done. I don't think it was a statement about a nation's ability to apply its laws extraterritorially, especially, again, when it's acting pursuant to a different source of international law authority, namely Article 17 of the 88 UN convention and the bilateral and multilateral agreements that the United States has entered pursuant to that, and, Your Honor mentioned that those are not directly implicated here because this is a stateless vessel, but both nations, the nations of the crew members here, Venezuela and Dominican Republic, do have bilateral agreements with the United States. But they weren't involved in this case. They were not. Yes, and I think it's also... They were reclaimed in this case by the government. Right, and this goes to a point, Your Honor, that Judge Tejada raised, and I did want to mention. He asked, I think, whether any nation is objective, and I don't think Mr. Clark was in a position to answer that, but I did ask the State Department, and it's hard to prove a negative, I think. If it's not part of the record, is it part of the record? It is not, Your Honor, and I'm happy to stop at this point. I wish you would not mention it. Okay, I will not mention it. Well, okay, as a matter of fact, I would like to ask you a question that I haven't been able to figure out. Does the record show exactly the latitude and the latitude where the vessel was boarded here? It does. I don't have a page number for you offhand, Your Honor, but I believe it was in the Coast Guard statements that were appended to the government's opposition to the motion to dismiss, and I did actually plot this, and I believe it's a point that ends up being almost due south of Ponce, Puerto Rico, many miles off the coast of Ponce, Puerto Rico. Can you please send a letter with the exact latitude and latitude? Yes, Your Honor, I can do that. If it's in the record, I would say you should do it. Does the record show where the... Does it show the port from which this vessel left? Was it Venezuela or Colombia, whichever it was? Ms. Clark indicated earlier that it would have left in Venezuela. I believe that the same source, Your Honor, that I'm recalling now indicated that one of the ports of call had been on the island of Dominica, which is southeast of Puerto Rico, if I'm recalling. But like I said, I will try to leaf through the appendix if I can find it right now, but if not, I will be happy to send a letter to the court with the pages in the record that contain information about the longitude and latitude and the previous ports of call, if any. All right. And do you have any position as to whether Palmer and Furlong are still good law? Your Honor, I just did find the citation. I'll answer the Palmer and Furlong question in just a moment if I can, but just start off to send a letter to the court, hopefully. The position of the event, this is listed at page 42 of the appellant's appendix, A42, 15.03 north, 067.01 west, approximately 150 miles south of Puerto Rico. All right. Can you say that in writing? Because I have difficulty writing that fast. Yes, Your Honor. Just for the other members of the court to benefit the pages at A42 of the appendix, and I'll do a letter to the court. On Palmer and Furlong, yes, Your Honor, I think they are good law, and I think they stand for principles of statutory construction, which is exactly how this court understood them in footnote seven of its opinion in Nuece-Pena, and how the 11th Circuit and the 5th Circuit have also understood those decisions in cases raising challenges to the MDLEA. So they're good law, and I think that they're somewhat inscrutable at certain points. I also should mention, Your Honor, that the court cited Furlong last year in a double jeopardy analysis in Gamble v. The United States in reaffirming the viability of the dual sovereignty doctrine under the double jeopardy clause. So I do think that they're good law, but they don't stand, in my understanding, for any principle of constitutional law or as restrictions on Congress's authority under Article I, Section 8, Clause 10. Rather, if anything, they are cases about statutory construction that accord with long-standing principles of declining to construe statutes as violating international law or as presuming extraterritorial application of U.S. law. But don't they stand for, if they're good law, don't they stand for the proposition that only certain crimes can be subjected to universal jurisdiction, and they being piracy, slavery, slave trafficking, and genocide? I don't read those cases as having addressed those matters. I think Your Honor is certainly correct that they assumed piracy was and is the quintessential universal jurisdiction crime, but I'm not sure, frankly, that the concept of genocide as a universal jurisdiction crime had really crystallized until the 20th century. You're absolutely right. So I excuse myself, but basically, for the principle that at that time, piracy was the only crime that could be declared under universal jurisdiction, and the other ones were adopted thereafter. Yes, Your Honor, I think that's correct, and I think the relevance of that really depends, I think, on a couple of things, on whether the court, first of all, is going to assume international law limitation on Article I powers of Congress, and secondly, if it does, whether the court accepts our understanding and our arguments about the applicability of the statelessness principle and the protective principle. If it does those things, it doesn't have to reach any question about universal jurisdiction. I just wanted to mention one other point about the text of the Constitution, just to underscore this. I don't think that you can tease out, as Professor Kontorovich just tried to, a universality limitation from the text or structure of that clause. In particular, we have the piracies, we have felonies, which is what's at issue here, and then we have the Law of Nations clause at the end. I don't think the Law of Nations clause, at that time, certainly, would have been a font, would have been limited or coterminous or synonymous with universal jurisdiction, because the canonical Law of Nations in the 1790s Crime Act, and it's been recognized by the Supreme Court, were assaults on ambassadors and interference with state passages. Those are both in the 1790s Crime Act, and those are not universal jurisdiction crimes. Like drug trafficking, they were universally condemned. But they're crimes with a nexus to the United States. They were, Your Honor, but I was just trying to address the universality point. I think it's a different question to try to suss out a nexus requirement from the text. I think piracy undermines that. If you're trying to look at commonalities among the three of those, piracy definitely doesn't have a nexus to the U.S., and I think it's hard to read a universality limitation into the text of that clause, because the Law of Nations would have reached domestic assaults on ambassadors, which I think no one thought that the United Kingdom, that England could prosecute an assault by an ambassador. So I don't think the text supports universality. I don't think the history does, either. And the reason is... Let me tell you a difficulty I find with your arguments, is that I see no difference between the jurisdiction that has been exercised by the United States in the present case, and what amounts to universal jurisdiction, in which you're allowed to exercise territorially, even though I have no nexus with the United States. You would agree that there's no nexus here, would you not? I would, Your Honor. And I take your point, but maybe I can try to address it this way, which is, if you think about the bottom line of what happens to a vessel like this in a consent case, a case where it's a foreign flag vessel, and a foreign nation pursuant to a bilateral treaty, or otherwise, consents to the U.S. assertion of jurisdiction over drug trafficking on the absent proof that the vessel was headed for U.S. shores. For those on the vessel, they may have the same concerns and complaints that Ms. Clark voiced earlier with her Afghan opium hypothetical, which is, they may say, we weren't headed for U.S. shores. We were trafficking drugs to Europe. I can't believe the U.S. is prosecuting me, and that my nation, Honduras, Colombia, Venezuela, whoever it was, consented to my serving time, my time in U.S. jail. I'm really horrified by that. That person may feel the same way. They may feel like they're being swept up in universal jurisdiction, but they're not. The jurisdictional basis there is consent. And so, I don't think it's problematic, as Judge Chaotic suggested earlier, for the U.S. to be on the vanguard of these issues, and to be trying to help resolve these terrible problems of international maritime drug by asserting jurisdiction and exercising interdiction powers on behalf of all nations. Counsel, consent by those nations is totally irrelevant, in my opinion, because what we're dealing with here is the power of Congress under Article 1, and no nation can give that power to Congress, only the Constitution. I think we're going to have to leave it at that point, Counsel, and we're going to forgo any closing statement by you. So, if you would, at this time, mute your audio. And, Attorney Clark, you can unmute your audio, and you have reserved a little time for rebuttal. Thank you, Judge. And I know I went over in the front end, so I'll keep it short and make just a few remarks. I want to start by referring the Court back to Larison v. Larson. By usage as old as the nation, the shipping laws have been construed to apply to areas in transactions, and with American law, we consider operative under prevalent doctrines of international law. The idea that the Supreme Court has looked to international law in assessing Title 46, which is where we are, is not new, and it's not novel. I'm not suggesting something that is unheard of in the jurisprudence. On the analysis of the statelessness of the vessel, I've mentioned it, and I want to reiterate, because I think it's terribly important, the definition of a stateless vessel under international law is far more limited than under the MDLA EA. The provision under which Mr. Ibar was taken into custody and prosecuted in the definition of international law statelessness. I think we can't ignore that fact. And then I also wanted to touch briefly on the sort of analysis of the congressional findings. If you look at those findings, you compare those to the protective principle. If the analysis is that's what Congress was looking to implement, then certainly it wouldn't make sense that Congress believed it could prosecute any felony unrelated to the United States in any way, shape, or form if it made these findings. There'd be no need to make findings if Congress thought that all felonies were fair game. But they make these findings, and if we're looking at it from the rubric of the protective principle, it goes well beyond the protective principle. It talks about societal well-being. It talks about the safety of maritime navigation. And I would also highlight the distinction that when Congress is speaking in the first part about vessels, there's no distinction as to statelessness or nationality of the vessels. However, later when that is amended and the submersible vessels component is added, the submersible vessel is explicitly defined as stateless. So under these findings, a vessel of foreign nationality that affects the societal well-being of the United States fits within the rubric. That's not the protective principle. And then I would just conclude, if I may briefly. I want to say that universal jurisdiction is not the only question. The way Congress can gain authority is through either universal jurisdiction or a nexus in the United States. The court doesn't have to find only about universal jurisdiction. I certainly have some concern that, again, I've not been terribly effective because some of the argument and questions have seemed to veer in the direction that that's the only issue. And I just want to make sure I highlight that nexus is the second piece. And I would, again, refer the court to the restatement fourth and just start with section 407, which, again, lists all the genuine connection, the nexus requirements that exist under international law. And with that, again, knowing that I'm well over my time as it is, I would very respectfully ask the court to vacate Mr. Ivar's conviction. And I certainly will thank the court very much for the time and opportunity to do this. I understand it's not easy doing this by phone to the court by any perspective. I appreciate that this case was significantly important that the court took the time to ensure that oral argument occurred. So I thank you. Thank you, counsel, and both counsel and my thanks to you, the court's thanks to you. You acquitted yourselves well. We will do the best we can with this case and we will take it under advisement. The clerk may call for recess. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.